WILLIAMS, Judge.
This is a suit in redhibition. Plaintiffs, William Schenker, Sr. (Schenker) and Residential Sales Corporation (Residential) are asking for recission and damages resulting from a sale. The case arises out of -the alleged unsuitability of a cedar sided plywood sold to Residential to be used on the exterior of a building project. Two types of plywood are in question: a four foot by eight foot ⅝ inch, five ply, western red cedar faced, reverse board and batten, mill certified siding; and a four foot by ten foot ⅝ inch, five ply, western red cedar faced, reverse board and batten APA certified siding. ITT-Rayonier, Inc. (ITT-Rayo-nier) through its Peninsular Plywood Division and Evans Products Co. (Evans), d/b/a Forest Products Group, manufactured the plywood which was bought by Bernard Lumber Company (Bernard) and sold to Residential, a corporation wholly owned and operated by William Schenker, Sr. The material was installed on a building owned by Schenker at 7901 Read Road in New Orleans, in May of 1979. In July of 1979, it was discovered that certain boards in the lot had begun to deteriorate and the plaintiffs contend that, because of the poor quality of the plywood, all of the plywood installed on the project must be removed and replaced at a substantial cost to the plaintiffs.
Plaintiffs filed suit on May 29, 1980 against ITT-Rayonier, Bernard, and Evans. Bernard reconvened against Residential for $48,801.89 due on .account for material used on the Read Road project of which $28,200.38 was for the plywood siding. These amounts were stipulated to by Residential. Additionally, Bernard filed a Third-Party demand against ITT-Rayonier, Evans, Lumbermen’s Merchandizing Corporation, Sequoia Supply, Inc., and several insurers. Sequoia and Lumbermen’s acted as middlemen in the sale of the plywood to Bernard.
ITT-Rayonier filed Third-Party claims against Bernard, Residential, the builder of 7901 Read Road, and Bon Marche Homes, the lessor of said property, also a Schenker corporation.
Prior to trial, the suit was settled as to Evans and Bernard’s claims against its insurers were severed for trial. Therefore, defendants at trial were ITT-Rayonier and Bernard. After the trial had concluded, but before the judgment had been rendered, the commissioner hearing the case resigned, and the case was reassigned, to a judge for the rendering of the judgment. The judge heard no testimony and rendered his decision based solely on the trial transcripts, the exhibits placed in the record and the post-trial memoranda submitted by counsel.
Judgment was rendered in April of 1984 in favor of plaintiffs against Bernard rescinding the sale of 130 mill-certified panels and 27 APA certified panels. Judgment was also rendered in favor of the plaintiffs against Bernard and ITT-Rayonier in soli-do for $50,736.00 in damages, with legal interest from date of judicial demand, constituting the replacement cost of off-grade panels including plumbing and electrical repairs and decking with the liability of Bernard limited to $3,538.55 with interest. ITT-Rayonier was held liable for $10,-000.00 in attorney’s fees with legal interest from date of judicial demand.
As to Bernard’s reconventional demand against Residential, the judgment was rendered in favor of Bernard for $48,801.89 with legal interest as provided by law, 5% of the principal and interest as attorneys’ fees and all costs directly attributable to the reconventional demand. Judgment was also rendered on the Third-Party demand of Bernard against ITT-Rayonier in favor of Bernard for the full amount for which Bernard is cast in the main demand. ITT-Rayonier was ordered to pay all costs not attributable to Bernard’s reconventional demand. All other claims and incidental demands were dismissed. ITT-Rayonier appeals, advancing eleven assignments of error. Schenker and Residential answer the appeal seeking an increase in the judgment. Bernard also appeals, but admits in brief that the appeal is “solely protective in na *508 ture” in that the lumber company is satisfied with the judgment.
Where the district court judge has decided a case upon the record made before another court, as is the case here, the scope of appellate review is broader than in the ordinary case. Since a trial judge who renders a decision solely on the record does not have the advantage of hearing, observing and, therefore, evaluating the witnesses, the rule of according great weight to his factual finding on appeal absent manifest error is inapplicable. Fabiano v. Bryan, 438 So.2d 719 (La.App.2d Cir.1983). We have, therefore, carefully reviewed the record and affirm the decision of the trial court as amended.
In reviewing the briefs of counsel, we have determined that there are three major issues on appeal: (1) whether Schenker had a right of action in redhibition; (2) whether ITT-Rayonier and Evans are co-debtors in solido; and (3) whether the monetary damages were proper in light of the expert testimony presented.
I.WILLIAM SCHENKER AS PROPER PARTY IN A REDHIBITORY ACTION
The defendants allege that the district court was in error in holding that Schenker had a right of action in redhibition. ITT-Rayonier and Bernard argue that an action in redhibition is available only to the buyer .of the defective thing and that Residential, not Schenker, was the buyer of the defective plywood. While acknowledging defendants’ well-reasoned but somewhat circular argument, we find that Schenker does have a redhibitory action. Schenker owns Residential as the sole shareholder. Additionally, Schenker is the owner of the Read Road project on which the plywood was placed. It is clear, therefore, that Schenker sustained damages in both capacities. We find that under the particular facts of this case there is no merit to the arguments presented by defendants and hold that Schenker does have a right of action in redhibition.
II. ITT-RAYONIER AND EVANS PRODUCTS AS CO-DEBTORS IN SOLI-DO
Prior to trial, the plaintiffs settle their claims against Evans, the manufacturer of 60 of the 284 4' x 10' panels used on the Read Road project. ITT-Rayonier argues that it is entitled to a pro rata reduction of any award granted to plaintiffs in accordance with La.Civ.C.Ann. 2203 prior to its repeal in 1984. We do not agree.
ITT-Rayonier and Evans each had a relationship with Bernard to furnish the company with plywood panels. The plywood manufacturers had no conventional relationship with each other as solidary obligees. Therefore, there is no release of ITT-Rayonier’s obligation of warranty under La.Civ.C.Ann. arts. 2476 and 2520.
Additionally, it was ITT-Rayonier’s burden to offer sufficient evidence at trial that the released co-defendant was a joint tortfeasor. Wall v. American Employers Ins. Co., 386 So.2d 79 (La.1980). In reviewing the record, we do not find that ITT-Rayonier has established that Evans was a joint tortfeasor and hence a solidary obli-gor. We conclude, therefore, that the determination of the trial court was proper.
III. DAMAGES
The district court awarded the plaintiffs $50,736.00, of which $3,539.55 represents the cost of 130 mill-certified panels and 27 APA certified panels, the sale of which the court rescinded. The balance of the award amounts to the cost of replacing the off-grade panels and doing other work occasioned thereby. Because both parties to the action are requesting a modification of the award, we have carefully reviewed the record to determine the proper amount of damages in light of the expert testimony.
The American Plywood Association sets standards for the manufacture of plywood. Manufacturers of plywood voluntarily adhere to these standards. Under the APA standards, exterior plywood, such as that in question here, must be made of plywood with no worse than C grade plies and exte *509 rior type glue. Mill-certified exterior plywood does not meet the standards outlined by the APA, rather it is a “generic” brand manufactured by each mill according to its own standards. In this case, the mill-certified plywood was manufactured as required by the APA standards, but with D grade plies. The plywood which was used on the building at 7901 Read Road consists of 766 4' x 8' mill-certified panels and 284 APA-certified panels.
The record contains copious testimony regarding the suitability of the panels for the project at 7901 Read Road. Initially, we find that the testimony indicates that Bernard was not a bad faith seller. While it is clear that the Bernard representatives were aware of the various grades of plywood, the testimony reveals that Bernard was not aware of any particular defect in the product lot as a whole, much less specific individual panels.
Secondly, we find that Schenker was well aware of the products he was purchasing and the quality thereof. It is true that there are a number of differences between the plies used in APA-certified panels and those used in mill-certified panels; differences which, if not disclosed to a purchaser, could result in a charge of misrepresentation. In the present case, however, such a charge is without basis. The testimony presented at trial reveals that Schenker was informed by representatives of Bernard of the different grades of plywood available for exterior use. The plaintiffs knew from the beginning that the plywood they were purchasing was not APA-certified, but that it was suitable for exterior use. In addition, Schenker had used equivalent mill-certified paneling on the exterior of a building prior to the construction of the Read Boulevard complex. In fact, this earlier building was to serve as the prototype for 7901 Read Road. We find there was no misrepresentation of the product to Schenker.
We find also that there was nothing inherently wrong with the product which was sold to Schenker. Testimony by experts indicated that the product in question here has been used on various buildings without complaint. As mentioned before, Schenker himself used an equivalent paneling on one of his own buildings. As confirmed at trial, while mill-certified panels do not meet federal government standards for exterior plywood this has not precluded the successful use of such panels on the exterior of buildings.
Since we find that there is nothing inherently wrong with the product, we must now consider how many panels were actually defective and the amount of damages resulting from these substandard panels.
ITT-Rayonier admits that certain panels were not acceptable to the builders and that these need to be replaced. Both sides presented experts who testified as to the number of defective panels actually on the project. It is a well-established principle that the weight accorded to expert testimony is determined by the professional qualifications, experience, and circumstances and materials upon which the expert’s opinion is based. Necaise, Inc. v. Vicknair, 391 So.2d 1347 (La.App. 4th Cir.1980).
Plaintiffs’ expert on plywood, Paul Short, presents impressive credentials and his testimony reflects his knowledge of wood products. Professor Short examined the plywood at the Read Road project and tagged certain panels to be removed from the project. The panels were removed and sent to Professor Short’s lab in Mississippi. Professor Short determined that as much as 80% of the panels were defective. While it is true that the evidence which Professor Short presented was supportive of Schenker’s claim we find that the sample chosen by Professor Short to establish the unsuitability of the panels was not a true random sample. Professor Short testified that he chose ten panels “intuitively”. On cross examination, however, it became clear that the panels chosen were those with obvious defects. Furthermore, panels were not removed from each of the buildings on the project. In short, the Professor selected from a restricted group of defective panels which renders his sample ineffective.
*510 In its defense ITT-Rayonier presented several experts in plywood manufacturing and grading. As a whole these experts determined that at least 15 and as many as 44 of the mill-certified panels were off-grade. Of particular interest to this court was the testimony of Walter Anderson and Emile Lamulle of the APA.
Mr. Anderson was accepted by the court as an expert in plywood manufacturing and plywood grading. Like Professor Short, Mr. Anderson did a study to determine the number of defective panels. We find that method used by Mr. Anderson more reliable in determining the damages sustained. In making his study, Mr. Anderson conducted an in-place, panel-by-panel inspection of the majority of the complex. He graded the panels and noted the condition of each panel. Based on his panel-by-panel inspection of the project, Mr. Anderson determined that 35 of the 766 4' X 8' mill-certified panels and 24 of the 284 4' X 10' APA-certified panels were defective. He also found that another 74 panels had an “area of delamination.” In conclusion, of 1,050 panels, Mr. Anderson found only 133, to be defective and in need of replacement.
Emile Lamulle testified on behalf of ITT-Rayonier qualified as an expert in the field of application of plywood production. Mr. Lamulle inspected a sample of 160 panels, 15 of these panels evidenced delamination. He also found that the installation of the panels was faulty in that the nailing averaged 16 inches on center rather than the recommended 6 inches. Mr. Lamulle testified that this poor installation caused the panels to weather too quickly and, ultimately, to deteriorate.
Robert Germany, testifying for ITT-Ray-onier, stated that his inspection revealed 44 defective panels. Robert Larsen determined that 15 to 30 of the mill-certified panels were defective.
In addition to presenting testimony as to the number of panels requiring replacement, the parties to this action presented testimony as to the cost of the repairs occasioned by the defective plywood. Plaintiffs’ estimates include the replacement of the defective panels, including the removal of decking, electrical and plumbing connections. The estimates also account for the possibility of damage to the interior of the buildings and the insulation. The estimates total $299,925.00 and $235,-079.00. The defendants’ expert testified that he would estimate the cost of the repairs to be $95,911.00.
Considering the expert testimony and the manner in which the plywood examinations were conducted, we determine that the number of defective mill-certified panels equals 109 at the most. We determine further that the number of APA-certified panels which are substandard is 24. This amounts to 133 defective panels representing 12.7% of the total panels used on the project. Using plaintiff’s lowest estimate on the cost of repair and applying the 12.7% figure, we find that the damages sustained by Schenker and Residential amounts to $29,855.03.
We conclude, therefore, that plaintiffs are entitled to the recission of the sale of 109 mill-certified panels and 24 APA-certified panels. The cost of the panels for which the sale is rescinded is $2,967.62. In addition, they are entitled to damages of $29,855.03, with legal interest from the date of judicial demand. The district court’s award of attorneys’ fees as an item of damages is affirmed at $10,000.00. The judgment is rendered against Bernard and ITT-Rayonier as solidary obligors with Bernard’s liability limited to the return of the purchase price. Bernard is entitled to full indemnity on its third party demand against ITT-Rayonier.
The judgment in favor of Bernard on its account for $45,262.34 is amended to $45,-834.27, with legal interest from the date of judicial demand, which represents the total of $48,801.89 less the $2,967.62 credit due as a result of the recission.
For the foregoing reasons, the judgment of the trial court is affirmed as amended.
AFFIRMED AS AMENDED.